Our first case is 23-3128, United States v. Poterbin. And Judge Ebel, would you give a little introduction? Thank you. In this first case, a jury convicted the defendant, Porterbin, of conspiring both to distribute methamphetamine and to possess methamphetamine for the purpose of distributing it. He was also convicted of kidnapping and using a firearm in furtherance of a drug-crafting crime. In this direct criminal appeal, Porterbin asserts that the district court abused its discretion in admitting trial evidence of other methamphetamine deals that he hadn't been charged with. The challenged evidence consisted of several text messages unrelated to the charged conspiracy, but arranging additional methamphetamine transactions involving, apparently, Porterbin. The trial court admitted that evidence under a rule in America called Federal Rule of Evidence 404. That evidence generally allows the prosecutor to put on evidence of other crimes as long as they're not admissible for the purpose of proving a person's character, that is, to show that the person is inclined to criminal behavior. But under that rule, evidence can be admitted for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, and lack of accident. So you can see there are a number of permitted purposes as well. The question in this case is whether the government introduced that communication of another crime for a permissible purpose or an impermissible purpose. Mr. Kumar? Good morning, Your Honors. May it please the Court, my name is Kevin Kumar, and I represent Mr. Porterbin in this appeal. The indicted events took place over the course of just three days, and then there are text messages three to five months later between Mr. Porterbin and an unknown person who has nothing to do with the underlying case. The government alleged that the text messages showed Mr. Porterbin engaging in other drug transactions, and therefore was relevant here to show knowledge and intent of the underlying conspiracy. But there was never even an arrest, let alone a conviction, relating to his other drug transactions. That took place over five, or up to five months after the charged conspiracy time frame. You don't contend that there's any problem with these acts being subsequent to the offense conduct, right? No, that's not what we're saying. It's more so that this has nothing to do with, it's outside the time parameters of the underlying conspiracy. It's dealing with an unknown person who has not been identified. This doesn't relate to a conviction or an arrest even. So is it not relevant? What is your position under Huddleston? What's your best argument for why there was error here? It's irrelevant, and its probative value is substantially outweighed by the prejudicial value, if I were to sum it up. It's irrelevant because, again, it has nothing to do with the case. The person involved, other than Mr. Porterbin, is not even tied to the underlying conspiracy that's involved in this case. My concern here is that the irrelevance actually bolsters the harmlessness case, and you didn't address harmless error in your reply brief. Can you speak to why the government hasn't satisfied its burden on harmlessness? Our position is that once that evidence got presented to the jury, we believe that it's sufficiently inflammatory. You can't unring the bell through the use of the jury instruction, limiting instruction. It was so unrelated to the underlying case. And also, the drug conspiracy that's involved in this case is not unique enough in relation to those text messages and those drug transactions. The government makes it a point to reference the ounce that was involved in the drug transaction. That's not unique enough. That's actually fairly common. And it was based purely on speculative evidence that's not relating to a charge or a conviction or an arrest. There was no lab testing done. It was purely text messages. And the government put on a witness on behalf of the FBI, making speculative statements and interpreting what those text messages meant. How should we be thinking about the fact that this evidence was presented on the fifth day of trial, and it was presented after other particularly damaging evidence for your client? How should we be thinking about that, both in terms of error and harmlessness? Sure. I actually think that goes to the heart of why this is so harmful. Even after the fifth day or it was until the fifth day, the government sought the need to introduce evidence that was very speculative. That was tangential. And it had nothing to do with the case. So it was it was a Hail Mary move on the government's part. And so that piece of evidence, those text messages, I believe, led to the conviction. The government says it introduced that evidence to prove two permissible things to prove knowledge. That is that this wasn't just unknown what this defendant was doing and intent intended to do drugs on the charge defense. So my question to you and then to your other opponent is, was knowledge and intent put at issue? Did the defendant say, oh, I didn't know it was drugs or I didn't intend to do drugs. I was had some other intent. Were those two issues put at issue by the defendant in this case? Yes, they were. They were at issue. However, those text messages don't actually go to intent or knowledge is our position. Why not? Because it was outside the time frame of the of the underlying conspiracy charge. Well, beyond, again, the conspiracy charge, the time frame was only three days. These text messages, text messages were three to five months later involving a person outside of the conspiracy completely. And again, the the text messages and the drug transaction that's alleged to have taken place there is not unique enough. There's no unique characteristic that really ties in those that subsequent drug transaction with the underlying case. And so it's really not relevant at all. And I think the probative value is substantially outweighed by the unfair prejudice as a result. So any any discernible probative value, even if it is minimally relevant, which I will give you, I can say it is minimally relevant. But that minimal relevance is substantially outweighed by the unfair prejudice. So it was the district court in this is, I guess, in the pretrial ruling when the district court's considering the four or four B objection. And and she says, for sure, it's not intrinsic to the conspiracy. But if there's a real issue about whether this defendant was supplying methamphetamine to the house and with somebody that dealt in certain ways, then this would be relevant to whether, in fact, he had the intent to distribute. Why is that wrong? Because the text messages, there's there's no there was no proof offered that those text messages were even related to a drug transaction. It was a witness on behalf of the FBI put on interpreting the text messages. But they were interpreted by an expert familiar with conversations and drug deals. And the expert testimony interpreting that conversation indicated that that conversation related to a drug transaction. So, Mr. Perturban, at that time, a few months later, definitely knew it was drugs and intended to sell it. Isn't that the purpose of introducing that? That that that may be so. Again, I think it's purely speculative that it relates to a drug transaction. But even if it was expert testimony relating to their experience and based on their experience, yes, this is a drug transaction. That is not relevant to this case, even if he did engage with other drug transactions, because there was no scrutiny applied to those subsequent acts. It was it was there was no arrest. There was no lab testing. There was no conviction. It's it's it's you can bring in anyone then and you could bring in my mom and you can ask her about any acts that I've done. And it goes to propensity to commit the same crime and over and over again, which is exactly what 404B disallows. Do you disagree that if even after the transaction for which he's charged, if later there's a transaction, that was the jury could find was a transaction in which the defendant intended to sell this drug, that that reflects on a claim that a few months earlier he didn't even know this was the drug and had no intent to sell it? I think if it was sufficiently similar, if it if it dealt with the same parties, if it was within a reasonable time frame, if the quantity of the meth was such a unique quantity and it was the same quantity or if the price was the same price. Why not just show that the felon knew what methamphetamine was and was willing to sell it, was interested in selling it? Why is that not probative that the claim that the trial, the defense of the trial, that he didn't know it was methamphetamine and didn't intend is not truthful? Well, again, I think it's not that it's I think it is probative. I think it is probative in a situation like you just highlighted that hypothetical. But I would think that that would still be outweighed by the prejudicial value, because that's other acts. It has to be substantially outweighed, and we defer to the judge's determination of whether it's substantially outweighed. Correct. That's a heavy burden to reverse on that. So you're saying it was unreasonable, but what you have to be saying is it was unreasonable for the judge to think that the prejudicial value did not substantially outweigh the probative value. Yes, Your Honor. That is our position. And again, as Your Honor has outlined, the evidence came in on the fifth day of trial. It was it wasn't sticking. And so they sought to introduce this evidence. And then that led to that conviction. I think it was highly inflammatory. The jury, in order to consider those subsequent acts, they had to consider it for the illegitimate purpose for propensity before we even get to intent or knowledge. I think that the fact that he engaged in other acts and that evidence being presented before the jury was a heavy otis on the jury. And I think that clouded their judgment. Can we go back to harmlessness? Sure. What is your best argument for why this evidence we shouldn't be looking at this evidence as playing a minor role in the context of the entire case? If I were to sum it up, Your Honor, it would be that, again, it came in late in the case. The government relied on it. Otherwise, they didn't mention it in closing, right? They did not mention it in closing. That's correct. Why did you say the government relied on it when it was not used in closing argument at all? I actually think saying nothing in a situation like that speaks more volume and is higher volume and is more impactful than actually emphasizing the point. So it's damned if you do and damned if you don't. If you talk about it, you relied on it. If you don't talk about it at all, that's proof you relied on it. Well, the evidence should not have come in, Your Honor. That's our position. I got your bottom line on that. But we believe that it was definitely a harmful error and the district court erred in refusing to grant a new trial. So respectfully, we ask Your Honor to reverse and remand for a new trial. If you have any questions, I would like to reserve the remainder of my time. Thank you very much. Good morning. Natasha Harnwell Davis on behalf of the United States. What do you begin by giving your account of what this evidence was and what it showed? Sure. So the evidence was that Mr. Poterbin was... The evidence being challenged. Yes, the text messages. Yes. So they were Mr. Poterbin using his phone to arrange drug deals about three to five months later in the same neighborhood for similar quantities of methamphetamine as the charged conduct. Now, he doesn't say this is meth with this quantities. You needed an expert to translate. Correct, Your Honor. And I think that actually goes to why this evidence was not as prejudicial, which is that it wasn't obvious to the jury that it was a drug deal. The agent had to interpret the fact that it like oranges methamphetamine. It certainly showed that Mr. Poterbin was very knowledgeable about drugs. He's discussing the quantity of supply, the pricing. Did he use the same slang or code words that were used in the charge defense as well? Not that we see. We don't have access to many of the messages. We don't see the coded language. The coded language simply goes more to the knowledge as opposed to the similarities. So what is the similarity? Because it seems that there isn't any similarity other than the same defendant. The similarity is he's dealing the same type of drug, different quantities, similar quantities. So in the different quantities, substantially different quantities. What were the quantities? Well, so in the charge conduct, there's testimony that he was dealing an ounce to Mr. West via Mr. Carr. Here he's discussing dealing ounce quantities of methamphetamine. So you do have, I would submit, similar quantities in the same neighborhood during a similar time frame. Later time frame. Later time frame. Certainly. Absolutely. So the individual with whom he was communicating has nothing to do with the underlying, with the charge defense, right? Correct. And I think that's a really important point in this case, which is that if this were evidence of the charge conspiracy or involved the same participants, we would be discussing this as intrinsic evidence. So that does not get this evidence. That does not resolve the question in this case. We're still in 404B. But if we were talking about the same David or the same conspiracy, which was actually charged much longer, it was a month, I think, March 2019 through April 19. So it was still outside the scope of what was charged, right? Absolutely. And if we in the counterfactual world, we would be talking, excuse me, about intrinsic evidence. But we're not talking about intrinsic evidence. So doesn't the person with whom the defendant is communicating go to the lack of similarity that you need under Huddleston to establish a proper purpose and relevance and so forth? It was certainly a different person. But I think this case fits very comfortably in cases like Davis, like Tennyson, like Kelly, where you have the subsequent conduct occurring a year later in a different state. Here we have the conduct occurring much closer in time. We have in a similar neighborhood. So they talk about the Argentine neighborhood, which is where the trap house was located. How different were the quantities? You said they were similar. Tell me again what the two quantities were. What was the charged quantity? So for the charge conduct, during the course of the charge conspiracy, there's testimony that Mr. Poterbin was supplying an ounce of methamphetamine to Mr. Carr, to Mr. West. What was the quantity? One ounce. And what was the quantity in the recording? It was, I think they discussed eight ounces in one of them. And G. David says he'd only like four. Four ounces? Mm-hmm. And I should say that the government is not limited to that single one ounce. That is just an indication in the transaction involving Carr and West that occurs about a week before the trap house incident. It was an ounce. So you don't believe it was introduced to show dramatically that this defendant was really a big-time mover of drugs because you don't think the quantities were different enough to try to get that message across to the jury? No, Your Honor. I don't think the government was trying to say, like, Mr. Poterbin was a large drug dealer. I do want to address three ways in which I think my friend has waived arguments in his reply brief. First is that he doesn't contest the adequacy of the jury instructions. So that's the fourth factor under the Huddleston analysis. Second, I don't think he contests that the court can resolve the Rule 404B analysis through— excuse me, resolve the Rule 33 analysis through Rule 404B. So this court could certainly join the First and the Eighth Circuits in kind of wrapping all of this up through Rule 404B. And I would also submit that my friend did not adequately address harmlessness in May. This court could certainly find that he has waived the harmlessness argument. Could we do that even though it's the government's burden? I think the failure to address it in the reply brief is a possibility of waiver. It's certainly not the only way of finding harmlessness in this case. You can certainly run through the merits, and I'm happy to do that. I'm happy to do that now unless the court has more questions on the direct Huddleston factors. Well, I guess I'll pose the same question to you as I did to the opponent. I mean, it seems that precisely what makes this evidence potentially— the admission of this evidence potentially harmless is also what makes it totally irrelevant. How should we be thinking about this? It's introduced on the fifth day of trial. It just seems like the government did not need this evidence. Or, by contrast, maybe you really did need it. So could you help me sort of reconcile what I see as a tension? Sure. So this actually goes to a question that Judge Ebel asked, which is, did Mr. Poterbin put intent and knowledge at issue? So first, following Old Chief, the government always bears the burden of improving the elements beyond a reasonable doubt. So the government, regardless of what Mr. Poterbin said, had to show that his intent and knowledge were met in this case. Mr. Poterbin did specifically put his intent and knowledge at issue in this case. You can see that, I believe, 1388 of the record where the district court makes that finding. So when we're thinking about the— What did he say that put his intent and his knowledge at issue? The district court was saying that— No, not the district court. What did Poterbin say about that? What was his—not him personally, but what was his defense on those two topics, intent and knowledge? His defense essentially was like, I had nothing to do with it. I wasn't involved. I think over the course of trial, the government well-established that he was present at the scene, so his defense had to become a little bit more, well, maybe I was there, but I didn't really know what was happening. So identity went away. Identity went away, yes. And so the district court made that finding and said, you know, I'm taking identity off the table. And so I think that demonstrates that the district court did not abuse its discretion. It was very thoughtful in how it considered this evidence. It waited to rule on the evidence. I do want to go back to your question about the difference between harmlessness and prejudice, which is those two are very distinct inquiries in that you're considering them at different points in time. So the district court is considering the prejudice at the time of admitting the evidence, and it's largely weighing the prejudicial value of the evidence against the probative value of the evidence in the context of trial, kind of up to that point. So that's an inquiry both for the district court, and it's occurring at a very particular point in time. When we're talking about harmlessness, that's a question for this court, and this court has the benefit of seeing the entire trial play out. So even though oftentimes the answer either can seem intention or, you know, if it's not prejudicial, then why did the government need it? But those are going to different points in time for different courts. So when we're thinking about the prejudice, we're asking, did the district court abuse its discretion? I submit that it did not do so here. And when we're talking about harmlessness, it's for this court to evaluate in the context of the entire trial, you know, was this government, excuse me, was this evidence particularly harmful? I would also point out that in cases like Veneno and cases like Rodella, going to prejudice, I want to put a marker in where I am in my argument, going to prejudice, those types of cases show that when the government is offering evidence that's of a similar emotional valence as the charged conduct, this court has said that the prejudice simply is not substantial. So when the jury is hearing incredibly disturbing evidence, as it heard in this case, and then later the fifth day of trial is hearing an agent interpret the text messages that are going to pretty generic, bland drug deals, it's unlikely that the jury is going to have an emotional response or improperly find Mr. Putterbin guilty. And the court gave a limiting instruction. Twice, Your Honor. Twice, actually. Was the first limiting instruction right after the evidence came in, or was there a time delay there? I think it was actually before the evidence came in. So I think the district court said, you are about to hear evidence. It gave five paragraphs of instructions. It made it very clear that it was limiting this evidence to the conspiracy count and that the jury could not use it for a propensity inference. I mentioned the conspiracy count in particular because in this reply brief, my friend indicates that it may have been offered for the kidnapping count, which is not correct. It was only offered for the conspiracy count. But then you can also look at page, I think it's 236 of the record, to see the final jury instructions, which again tell the jury you can only consider this for the conspiracy. You can only consider it for a non-propensity purpose. I would like to address harmlessness unless the court has further questions. I have one more question. How should we be thinking about the government's position that the text messages can't be unfairly prejudicial because the charge conduct in this case is so much more severe than what was in the text messages? This sort of relative severity, what is the basis of that argument? How should we be thinking about that? You can see that argument in this court's decisions like Menino and Rodella, and I think what it's going to is what the Supreme Court talked about when it was talking about prejudice, is we don't want juries to simply convict a person because they think they're a bad person. And the fallout from that is that when the jury is hearing incredibly disturbing testimony, as they did in this case about the beating, the shooting, the stabbing, the jury is unlikely to then feel this emotional sense of this is a really bad person when they're hearing the 404B evidence that's either of a similar nature or kind of a less emotional nature. So the relative severity is the text messages against other evidence. You're not comparing the charged conduct, it's the offense conduct itself.  You're asking us to look at the, okay. Yeah, yeah, yeah. As I understand what you're saying, the evidence of the crime itself would have made the jury think that the defendant's a bad person. Yes, that is what it boils down to, Your Honor. Going back to Judge Rossman's question, I think you can see that analysis play out in the Venino case and the Rodella case, where this court is comparing the offered direct evidence of the charged conduct compared to the rule 404B conduct. I see I have a few minutes left, so I'd like to address harmlessness. Certainly, harmlessness is the easiest way to decide this case. The government offered two theories of Mr. Poterbin's involvement. The first was that Mr. Poterbin was directly dealing drugs in this case. I want to highlight some of that evidence before I turn to the second theory. You have Mr. Poterbin's confession that he was dealing half-pound quantities of methamphetamine, so that's certainly a larger amount than we have been talking about with ounces. You have Mr. West's testimony that Mr. Carr drove Mr. West to Mr. Poterbin's house to get the ounce of methamphetamine. You have the testimony that Mr. Poterbin pistol-whipped a person named Smurf approximately a week before the kidnapping. All of this is within the charged conduct. And you have that Mr. Poterbin needed the $500 to re-op that evening of April 18th. The government also had a second theory of this case, which is that Mr. Poterbin was involved in the kidnapping and torture as a way of enforcing a drug debt. You have his direct confession that he was beating the victim in this case for the principle of it, that it wasn't for the $500, but it was, quote, for the principle. You have Mr. Carr's statements to Ms. Vanini that, you know, you're stealing our money, we are going to take it out. You have Ms. Vanini hearing the second person in the background, and the government established that Mr. Poterbin was present. And you have the victim's testimony that Mr. Poterbin pistol-whipped him, beat him, wrapped his head in a T-shirt so that he would have a hard time breathing, beat him with a blunt object, tried to cut off his finger. Possibly, it sounds like there was something to do with his eyes possibly being glued shut. Is this all before the fifth day of trial? Yes. And then you also have the fact that Mr. Poterbin ordered Ms. Serna to stab the victim in the leg so that she would be just as guilty. The other thing that this court can look at to confirm its harmlessness analysis is that the jury did find Mr. Poterbin guilty of the kidnapping count. It also found Mr. Carr guilty of the very same conspiracy and a 924C count, all of which indicates that the jury credited the witness's testimony. So, unless this court has any further questions, I ask that it affirm. Thank you. Thank you, Your Honor. Mr. Kumar, you have a couple minutes left. Thank you, Your Honors. I'd like to address just a few points that my colleague raised. The first is, there was a mention of the subsequent drug transaction being a different buyer, and that's important because that shows that it's a separate conspiracy. Otherwise, it would be the same conspiracy. It can still be the same conspiracy, even if it was a separate buyer. If it was sufficiently, shared a sufficient nexus to the underlying conspiracy, it could still be part of the underlying conspiracy. So, the fact that it's a different person in the subsequent drug transaction, I think is vitally important, along with the temporal distance between the underlying conspiracy and the subsequent conspiracy. My friend raised a number of cases and cited to them in the answering brief, including Davis, Kelly, Rodello, Veneno. All of those cases deal with convictions, or arrests, or whether actual lab testing of the drugs. We do not have that here. We just have text messages that were testified on behalf of an FBI witness, and the text messages relate to a drug transaction involving a person that has nothing to do with the underlying case. The government couldn't cite to a single case where the subsequent or other act related to an uncharged crime, or a crime that did not involve lab testing or an arrest. And just to be clear, with respect to Huddleston, our position is that the evidence fails prongs two and three. That it's irrelevant, and that it's probative value, if any, is substantially outweighed by unfair prejudice. As far as the harmless error rule, we did not waive it. We raised it in our opening brief. I did raise it in my reply as well. And I can go into that. The practical reality is, if Mr. Potterman were found to have been involved in the underlying drug transaction or kidnapping, then the elements of intent and knowledge, which is the government's purported basis for getting the evidence in, were really no issue at all. If the government had a strong case on the intent issue... I'm sorry? But you're basing that on the verdict. And the prosecution doesn't know what the jury's going to believe yet. Well, my colleague outlined a number of pieces of evidence allegedly tying Mr. Potterman to the case. And so the evidence was strong, right? So then why let this other evidence in, or why seek the evidence in if the evidence was so substantial and so weighty and so strong and so convincing? It wasn't. It was this evidence that had nothing to do with the case that convicted Mr. Potterman. The government had inconsistent and limited direct evidence tying Mr. Potterman involved in the case. And I think that's why they sought to get the evidence in and that impassioned the jury to convict Mr. Potterman on all accounts. And an unbalancing test should not have been allowed in the first place. I would like to also highlight that the district court was thoughtful in evaluating the prejudice aspect of the evidence. However, and the district court acknowledges that the evidence was prejudicial, but did not actually go on to state or analyze whether the prejudice was unfair. And that's in the transcript. Your time has expired, so wrap up very quickly. I'm sorry? Your time has expired. May I provide the cite? Very quickly. Okay. That citation is... Sorry. Do you want to do that in the 20HA letter? Why don't you do it that way? Just give us the 20HA letter. Okay, we'll do that. Thank you. You were just wanting to get the citation, right? Yes, I just wanted the citation. Okay, we'll do it. That's good, but we don't need that this instance. Okay. Thank you so much. Thank you, counsel. Case is submitted. Let's see.